IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JAMES TYLER,  :

    Plaintiff,

  v.  :  Case No. 3:13-cv-419

FEDEX FREIGHT, INC.,  :  JUDGE WALTER H. RICE

    Defendant.  :

---

DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. #14) AND GRANTING DEFENDANT JUDGMENT AS A MATTER OF LAW; DEFENDANTS' MOTIONS IN LIMINE (DOC. #25 & DOC. #26) AND MOTION TO CONTINUE DEADLINE FOR FILING JOINT FINAL PRETRIAL ORDER (DOC. #29) ARE OVERRULED AS MOOT; JUDGMENT TO ENTER IN FAVOR OF DEFENDANT AND AGAINST PLAINTIFF; TERMINATION ENTRY

---

Plaintiff James Tyler ("Plaintiff" or "Tyler") filed suit against Defendant FedEx Freight, Inc. ("Defendant" or "FXF"), alleging that FXF terminated his employment because of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1). The Court's subject matter jurisdiction is based on the federal question statute, 28 U.S.C. § 1331, as well as upon the specific grant of jurisdiction under 42 U.S.C. § 20003-5(f)(3) applicable to Title VII claims.

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. #14). For the reasons set forth below, the motion is SUSTAINED.

I.     **FACTUAL BACKGROUND**

FXF provides freight services in the United States and abroad. The company operates a number of distribution centers, including one in West Jefferson, Ohio, where Tyler worked. FXF refers to the West Jefferson facility as its Columbus, Ohio, Service Center. Ross Decl. ¶¶ 2-3 (Doc. #14-2 at 2).

Tyler began working for FXF's predecessor-in-interest, FedEx National LTL, in January, 2010, as a line haul truck driver at a facility in Dayton, Ohio. Tyler Dep. at 27-28 (Doc. #17 at 8); Ross Decl. ¶ 7 (Doc. #14-2 at 2). In late 2010, FedEx National LTL and FXF merged. Ross Decl. ¶ 7 (Doc. #14-2 at 2). On December 2, 2010, FXF offered Tyler employment at the Columbus, Ohio, Service Center, effective January 30, 2011. *Id.*; Tyler Dep. at 31 (Doc. #17 at 9).

When Tyler accepted the job with FXF, he signed a document entitled "Employment Conditions." *Id.* Ex. 19 (Doc. #14-2 at 80-81). Paragraph 13 of the document stated:

> To the extent the law allows an employee to bring legal action against [FXF], I agree to bring that complaint within the time prescribed by law or 6 months from the date of the event forming the basis of my lawsuit, whichever expires first.

*Id.*

FXF uses a four-stage progressive disciplinary policy. The first violation of a company policy results in a "coaching session," during which a "determination will be made if proper education has been given and the employee understands the performance and behavior expectations." Tyler Dep. Ex. 5 at 1 (Doc. #17 at 63).

2

At the second stage, the employee receives a "written corrective action," which addresses "a second offense of similar severity or when further corrective action beyond coaching sessions is necessary." *Id.* at 2 (Doc. #17 at 64). Depending on the severity of the violation, the second step may be omitted. *Id.* The third stage is a "critical written corrective action," with the option of suspending the employee. *Id.* At the last stage, any further similar violations within the preceding twelve months may result in the employee's termination. *Id.*

Tyler received coaching for failing to call the Service Center dispatcher on May 24, 2011, when he was late returning from a delivery run.[1] Tyler Dep. Ex. 7 (Doc. #17 at 68). On August 24, 2011, Tyler received a critical written warning after returning 4 hours and 32 minutes late from a delivery trip to Youngstown, Ohio, and failing to notify FXF of the delay. Tyler Dep. at 68 (Doc. #17 at 18).

On August 22, 2012, Tyler drove two trailers from Columbus to Clarksburg, West Virginia, and returned the next day. Tyler Dep. at 99-100 (Doc. #17 at 26). Although the standard time for each leg of the route is 4 hours and 10 minutes, the trip to Clarksburg took 4 hours and 31 minutes, and the return trip took 5 hours and 24 minutes. Ross Decl. Ex. 9 at 1 (Doc. #14-2 at 47). Tyler admits to arriving late after the Clarksburg run. Tyler Dep. at 105 (Doc. #17 at 28).

---

[1] At his deposition, Tyler did not recall receiving the May 24, 2011, coaching, but did not dispute receiving it. Tyler Dep. at 67 (Doc. #17 at 18). The coaching is listed as a prior corrective action on the August 24, 2011, record of the critical written warning that Tyler received. Tyler Dep. Ex. 7 (Doc. #17 at 68).

3

After Tyler arrived, FXF Assistant Service Center Manager Lance Appleman ("Appleman") asked Tyler why he was so late. Tyler initially responded that he had taken a break at a truck stop for fifteen to twenty minutes. Appleman asked Tyler why he had arrived ninety minutes late if he had only stopped once for twenty minutes. Tyler responded that he had also taken a lunch break and run into traffic. Appleman compared Tyler's explanations to the data recorded by the handheld GPS device that FXF's drivers carry on all runs. The data contradicted Tyler's assertion. According to the device, Tyler had stopped three times, for periods of 15, 16, and 52 minutes, and had taken a lunch break before leaving Clarksburg. Because of Tyler's previous corrective actions and these discrepancies, Appleman referred the matter to FXF Human Resources Adviser Scott Ross ("Ross") for an investigation. Ross Decl. Ex. 5 at 2 (Doc. #14-2 at 33).

Ross contacted Tyler as part of the investigation, and Tyler provided the same explanation for his late arrival that he had given to Appleman, including asserting that he had only stopped once on the return trip.[2] Ross. Decl. ¶¶ 27-28 (Doc. #14-2 at 7). After speaking with Tyler and reviewing FXF's data, Ross concluded that Tyler committed the following acts of dishonesty: 1) telling Appleman that he had only stopped once for fifteen to twenty minutes, when the handheld GPS device recorded multiple stops, and then changing his story to

---

[2] When deposed, Tyler admitted that he had actually stopped more than once on the trip back to Columbus. Tyler Dep. at 102 (Doc. #17 at 27).

4

Appleman when questioned; 2) telling Ross that he had only stopped once during the trip from Clarksburg to Columbus; 3) falsely telling Ross that he had sent a message to FXF's dispatcher about the delay; and 4) recording a lunch break on the handheld device before leaving Clarksburg, but telling Ross that he later took a lunch break while returning to Columbus. *Id.* On August 27, 2012, FXF suspended Tyler's employment. Tyler Dep. Ex. 12 (Doc. #17 at 81).

Ross recommended terminating Tyler to FXF's management. The termination was approved on September 7, 2012. Ross. Decl. ¶¶ 29-30 (Doc. #14-2 at 8). Tyler appealed to an internal review committee, but it upheld the termination. *Id.* ¶¶ 35-36 (Doc. #14-2 at 8-9).

## II. PROCEDURAL HISTORY

On August 28, 2012, the day after FXF suspended his employment, Tyler dual-filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC") and the Ohio Civil Rights Commission. Tyler Dep. Ex. 12 (Doc. #17 at 81). On June 27, 2013, the Ohio Civil Rights Commission issued a determination that no probable cause of discrimination existed to support the charge. Tyler requested reconsideration. Tyler Dep. at 190 & Ex. 17 (Doc. #17 at 49 & 85). On August 15, 2013, the Ohio Civil Rights Commission again concluded that no probable cause of discrimination existed. Tyler Dep. at 195-96 (Doc. #17 at 50). The EEOC adopted the finding and issued a Tyler right-to-sue notice on September 26, 2013. Tyler Dep. Ex. 23.

5

On December 17, 2013, Tyler filed suit against FXF, alleging that he was subject to disparate treatment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), because FXF had not terminated the employment of similarly situated, non-minority employees who had committed similar or more serious violations. Doc. #1.

On January 12, 2015, FXF filed a Motion for Summary Judgment under Rule 56 of the Federal Rules of Civil Procedure. Doc. #14. FXF argues that it is entitled to judgment as a matter of law for three reasons. First, Tyler's claim is time-barred by the limitations period that he agreed to as a condition of accepting employment with FXF. *Id.* 11-13. Second, his prima facie case of race discrimination fails because he cannot point to a similarly situated employee outside of his protected class that FXF treated more favorably than he. *Id.* at 13-19. Third, FXF terminated Tyler for the legitimate, nondiscriminatory reason of dishonestly, and there is no evidence of pretext to the contrary. *Id.* at 19-20.

On February 9, 2015, Tyler filed a Memorandum Contra Defendant's Motion for Summary Judgment. Doc. #20. Therein, he argues that several non-minority drivers were treated more favorably than he, including a driver who "jackknifed" a truck without being terminated, and another who was involved in several accidents, but was offered another position at FXF before later being terminated. *Id*. at 4-5. Tyler also argues that the supposed discrepancies between driver logs and GPS records raise genuine issues of material fact because drivers' records are

6

commonly inaccurate. *Id.* at 5-6. He also asserts, for the first time, two new claims. First, he was allegedly subject to racially-motivated harassment because an unidentified manager "nitpicked [his] performance" and "reprimanded him for minor rule infractions" while not doing the same to Caucasian co-workers. *Id.* at 6. Second, his termination allegedly violated public policy because the stops he took when returning from the Clarksburg trip complied with 49 C.F.R. § 392.3, which prohibits the operation of a commercial truck by a fatigued or ill driver. *Id.* at 6-7.

FXF filed a Reply Brief on February 23, 2015, and made several points. Doc. #22. First, Tyler's Response fails to address the argument that the six-month limitations period bars his claim. *Id.* at 2. Second, he cannot assert new claims for the first time in response to a Motion for Summary Judgment. *Id.* at 2-6. Third, the employees Tyler mentions were not similarly situated to him because FXF terminated his employment for dishonesty, not poor driving. *Id.* at 7. Fourth, the assertion that the driver logs were inaccurate is merely Tyler's unsubstantiated opinion. *Id.* at 8-10. Finally, Tyler's affidavit is insufficient to resist summary judgment because assertions are based on hearsay, opinion testimony, and without factual foundation, and are therefore inadmissible. *Id.* at 10-11.

### III. STANDARD OF REVIEW - MOTION FOR SUMMARY JUDGMENT

When a party moves for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant's burden is to demonstrate "the absence of a genuine issue of material fact as to at least one essential element on each of the Plaintiff's claims." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572 (6th Cir. 2000) (citing *Celotex*, 477 U.S. at 322).

Once the moving party has demonstrated that no disputed issue of material fact exists, the burden shifts to the nonmoving party to present evidence of a genuine dispute of a material fact that is resolvable only by a jury. *Celotex*, 477 U.S. at 324. The nonmovant must "cit[e] to particular parts of materials in the record" to demonstrate the existence of a genuine dispute of material fact, or otherwise "show[] that the materials cited" by the moving party do not demonstrate that no disputed issue of material fact exists. Fed. R. Civ. P. 56(c)(1). At this stage, it is not sufficient for the nonmoving party to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the nonmoving party must "go beyond the pleadings" and present some type of evidentiary material that demonstrates the existence of a genuine dispute. *Celotex*, 477 U.S. at 324. "The mere existence of a scintilla of evidence in

support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Conversely, material facts in genuine dispute that "may reasonably be resolved in favor of either party" require denial of summary judgment in order to be properly resolved by a jury. *Anderson*, 477 U.S. at 250.

When ruling on a motion for summary judgment, a court must assume the evidence of the nonmoving party to be true and draw all reasonable inferences in that party's favor. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A court must avoid "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts," as such are "jury functions" that are inappropriate to employ at the summary judgment stage. *Id.*

IV. **ANALYSIS**

The threshold issue before the Court is FXF's argument that Tyler's claim is barred by the six month limitations period that he agreed to as a condition of his employment, given that he filed suit on December 17, 2013, over a year after his September 7, 2012, dismissal. Doc. #14-1 at 11. Citing *Thurman v.*

9

*DaimlerChrysler, Inc.*, 397 F.3d 352 (6th Cir. 2004), FXF argues that the Sixth Circuit has held that such conditions are reasonable and has enforced six-month limitations periods in employment agreements. *Id.* at 11-12. FXF also points to several district court decisions that have enforced the exact provision of the agreement that Tyler signed in litigation involving employees of its affiliated companies. *Id.* at 12.[3] Tyler's Memorandum in Response fails to address this argument.

Title VII sets forth a strict timeline for both the initial presentation of a discrimination claim to the EEOC (or its state counterpart) and any subsequent filing of a civil action. Once an unlawful employment practice occurs, a person must file a charge of discrimination with the EEOC within 180 days. 42 U.S.C. § 2000e-5(e)(1). The charge is not a "complaint" and does not commence a civil action, "but merely informs the EEOC of possible discrimination." *EEOC v. Frank's Nursery & Crafts, Inc.*, 177 F.3d 448, 455 (6th Cir. 1999) (citing *EEOC v. Shell Oil*

---

[3] Because these cases do not apply the limitations provision to Title VII claims, they are not on point. *Tompkins v. Fed. Express Corp.*, No. 2:09-cv-02073, 2010 WL 1780232 (W.D. Tenn. Apr. 30, 2010) involved a claim under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301, and state law claims under the Tennessee Human Rights Act, Tennessee Code Ann. § 4–21–101. *Ray v. Fedex Corporate Servs.,* 668 F. Supp. 2d 1063, 1067 (W.D. Tenn. 2009), applied the limitations provision to a claim brought under the Age Discrimination in Employment Act of 1967, 29 U.S.C.A. § 621. *Boaz v. Federal Express Corporation*, 742 F. Supp. 2d 925 (W.D. Tenn. 2010), is particularly unpersuasive, because its enforcement of the limitations provision to a claim brought under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 206(d), was reversed on appeal to the Sixth Circuit. *Boaz v. FedEx Customer Info. Servs.*, 725 F.3d 603, 607 (6th Cir. 2013).

*Co.*, 466 U.S. 54, 68 (1984)). The EEOC must investigate and determine if "reasonable cause exists" to support the charge, and, if so, "endeavor to eliminate [the] alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." 42 U.S.C. § 2000e-5(b). Failing this, the EEOC may bring a civil action against the employer, and the aggrieved employee may intervene in the action. *Id.* § 2000e-5(f)(1).

However, if the EEOC dismisses the charge because it lacks reasonable cause, finds reasonable cause but chooses not to sue, or does not file an action within 180 days of the filing of the charge, it must notify the employee that he or she may bring a Title VII action against the employer, but must do so within 90 days. *Id.* The EEOC must also issue a notice of right to sue upon request, but may only issue the notice 180 days after the filing of the charge. *Id.*; 29 C.F.R. § 1601.28(a)(1). In any case, a person may not bring a Title VII claim without receiving a right-to-sue notice from the EEOC, as such notice is a "condition precedent" to filing suit. 42 § 2000e-5(f)(1); *Rivers v. Barberton Bd. of Educ.*, 143 F.3d 1029, 1032 (6th Cir. 1998). Thus, the 180-day period to bring a charge and the 90-day period to file suit after receipt of the EEOC's "right to sue" notice are recognized as limitations periods for Title VII claims. *See, e.g.*, *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982) (holding that the initial period for "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a statute of

limitations, is subject to waiver, estoppel, and equitable tolling"); *Truitt v. Cnty. of Wayne*, 148 F.3d 644, 646 (6th Cir. 1998) (recognizing that "[a]lthough *Zipes* dealt only with the time limit for filing charges of discrimination with the EEOC, [] its logic has been extended to the ninety-day time limit for filing suit in the district court after receipt of a right-to-sue letter"); *Seay v. Tenn. Valley Auth.*, 339 F.3d 454, 469 (6th Cir. 2003) (applying equitable tolling to untimely filed Title VII claim where a plaintiff had relied on an EEOC determination based on the employer's misrepresentation).

During the "180 days after the filing of a charge, the EEOC retains 'exclusive' jurisdiction over the subject matter of that charge." *Frank's Nursery*, 177 F.3d at 456 (6th Cir. 1999) (quoting *General Tel. Co. v. EEOC*, 446 U.S. 318, 326 (1980). As explained by the Sixth Circuit in *Frank's Nursery*:

> During that period, the EEOC may distinguish between those cases in which it believes it may vindicate the public interest by filing suit itself, and those in which it chooses not to file suit and instead leaves to the individual aggrieved the decision of whether to file suit in order to advance her own interests. Indeed, it is only at the termination of the 180–day period of exclusive jurisdiction that a "complainant whose charge is not dismissed or promptly settled or litigated" may bring a lawsuit. *See Occidental Life Ins. v. EEOC*, 432 U.S. 355, 361 (1977). Not only does Title VII bar an aggrieved individual from suing a private employer in federal court during that period without authorization from the EEOC, it bars an aggrieved individual from ever bringing such a suit should the EEOC choose to sue on its own. In such cases, the only right Title VII reserves to an aggrieved individual is the right to intervene in the EEOC's action.

*Id.* (some citations omitted).

*Thurman v. DaimlerChrysler, Inc.*, 397 F.3d 352 (6th Cir. 2004), the main Sixth Circuit opinion on which FXF's argument relies, does not directly address the enforceability of an agreement limiting the time an employee may bring a Title VII claim. In *Thurman*, the plaintiff signed an employment application that contained a clause agreeing to file any lawsuit against her employer within six months of an adverse employment action and waiving any applicable statute of limitations. *Id*. at 354. After being groped by a coworker, she brought an action against her employer in federal district court. In her original lawsuit, the plaintiff alleged "violations of the Michigan Elliot Larsen Civil Rights Act, Title VII, 42 U.S.C. § 1981, and various state law tort claims." *Id.* at 355. Six months later, the district court dismissed the lawsuit "due to the repeated failure of the [plaintiff's] counsel to appear and participate in court ordered conferences." *Id.* Instead of moving to have the action reinstated, the plaintiff filed a second action, but waited another eight months to do so. *Id.* The second action again alleged violations of the Michigan civil rights statute, 42 U.S.C. § 1981, and state law tort claims, but did not include a Title VII claim. *Id.* at 354; *see also Fritz v. FinancialEdge Comm. Credit Union*, 835 F. Supp. 2d 377, 383 (E.D. Mich. 2011) (examining second complaint filed by the *Thurman* plaintiff and noting that "no Title VII claim was included").

Applying Michigan law that enforces "reasonable" abridgements of limitations periods in employment contracts, the Sixth Circuit rejected the

13

plaintiff's argument that the clause was adhesive. *Thurman*, 397 F.3d at 357. The court noted that it had previously "determined that there is nothing inherently unreasonable about a six-month limitations period contained in an employment agreement." *Id.* (citing *Myers v. Western–Southern Life Ins. Co.*, 849 F.2d 259, 262 (6th Cir.1988)). The reasonableness of the clause was evidenced by the fact that the plaintiff "had ample time to investigate her claim and determine her damages" before filing her first lawsuit "within the abbreviated limitations period." *Id.* at 358. She had filed "a [charge] with the Michigan Department of Civil Rights on September 29, 1999, and filed a criminal complaint against [her coworker] on October 20, 1999," was given an indefinite leave of absence from her employer on February 26, 2000, and filed the first lawsuit on June 1, 2000. *Id.* at 355 & 358. The plaintiff's second lawsuit was filed in August, 2001, over a year after her original complaint, and, as mentioned previously, it did not restate the Title VII claim. Thus, in *Thurman*, there was no analysis of the impact that a provision shortening the limitations period would have on a plaintiff's ability to bring a Title VII claim, or the "reasonableness" of such a provision in light of the rigid and precise timeframe for bringing a claim dictated by the statute and its implementing regulations.

District courts in the Sixth Circuit addressing this issue have held that to be enforceable, an agreement limiting the time an employee may sue under Title VII must not commence the limitations period before the end of the EEOC's exclusive

14

jurisdiction over the matter. *Lewis v. Harper Hosp.*, 241 F. Supp. 2d 769, 772 (E.D. Mich. 2002) (rejecting the application of a limitations clause to Title VII claim and stating that "[w]ere this Court to uphold the six month limitation of action clause as to Plaintiff's Title VII claim, the EEOC's period of exclusive jurisdiction would have the effect of abrogating Plaintiff's ability to bring a Title VII suit"); *Fritz v. FinancialEdge Comm. Credit Union*, 835 F. Supp. 2d 377, 383 (E.D. Mich. 2011) (applying *Lewis* and holding that "any [contractual limitations] period of 180 days or less is preempted by the EEOC's period of exclusive jurisdiction); *Priemer v. Int'l Auto. Components*, No. 10-cv-12969, 2013 WL 4718336 at *5-6 (applying *Lewis* and *Fritz* and commencing six-month period of limitations from time plaintiff requested right-to-sue letter from EEOC). *Fritz* is particularly instructive because it discusses whether *Thurman*, which was decided after *Lewis,* allowed for the application of a contracted limitations period to a Title VII claim. *Fritz* examined the *actual* complaint filed in the second *Thurman* lawsuit and its "review . . . confirm[ed] that no Title VII claim was included" when the plaintiff brought the second action. *Fritz*, 835 F. Supp. 2d 377, 383 (E.D. Mich. 2011).[4]

---

[4] The Court acknowledges the contrary conclusion reached in *Ellison v. DaimlerChrysler Corp.*, No. 3:06-cv-899, 2007 WL 3171758, at *5 (N.D. Ohio Oct. 30, 2007). In *Ellison*, the court interpreted *Thurman* to apply to Title VII claims, based on language in the opinion stating that the second lawsuit alleged "the same claims as the previous suit." *Id.* However, as noted above, the *Fritz* court examined the *actual* complaint filed in the second *Thurman* lawsuit, which revealed that "no Title VII claim was included." *Fritz*, 835 F. Supp. 2d 377, 383 (E.D. Mich. 2011). In any case, the *Ellison* court stated that its interpretation was "not necessarily a legal holding" because the defendant had "apparently

15

The Court agrees with *Fritz* that *Thurman* did not enforce a shortened limitations period that interfered with the EEOC's period of exclusive jurisdiction over a Title VII claim, since no such claim was part of the case by the time it reached the Sixth Circuit.

Accordingly, the Court will follow *Fritz*, *Lewis*, and *Priemer*, and conclude that, in order for the shortened limitations period in Tyler's employment agreement to be enforceable, it must not interfere with the EEOC's period of exclusive jurisdiction over his discrimination charge. FXF's suggestion that the limitations period should commence on September 8, 2012, the day after it terminated Tyler's employment, would create such interference. Because he filed the charge on August 28, 2012, the 180-day period of the EEOC's exclusive jurisdiction ended on February 24, 2013. Tyler Dep. Ex 12 (Doc. #17 at 81). Under FXF's theory, Tyler would have been required to have filed suit by March 7, 2013, just two weeks after the end of the EEOC's exclusive jurisdiction over the matter. This would have rendered nugatory the 90-day deadline of any right-to-sue letter that he might have obtained at that time and made it impossible for him to file suit. Because this would effectively abrogate Tyler's ability to bring a Title VII claim, it would be unreasonable to commence the limitations period from the date of his termination. *Lewis*, 241 F. Supp. 2d at 772.

---

concede[d] that *Thurman* did not apply to Title VII claims." *Ellison*, 2007 WL 3171758, at *5. Because *Fritz* reached a holding based on an actual examination of the *Thurman* complaint, the Court finds its analysis more persuasive.

16

A reasonable application of the limitations clause would commence upon the expiration of the EEOC's 180-day period of exclusive jurisdiction over Tyler's charge, on February 24, 2013. At that time, Tyler had the statutory right to request a right-to-sue notice from EEOC, which would have left ample time to file his Title VII claim before the limitations period elapsed on August 23, 2013. 42 U.S.C. § 2000e-5(f)(1); 29 C.F.R. § 1601.28(a)(1). Instead, Tyler requested reconsideration of the initial "no probable cause determination," did not receive a right to sue letter from the EEOC until September 26, 2013, and did not file this lawsuit until December 17, 2013. Tyler Dep. Ex. 23; Complaint (Doc. #1). Thus, he filed this lawsuit nearly four months after the expiration of the six month limitations period. Even if the limitations period were extended to account for a 90-day notice period for filing suit commencing at the end of the of the EEOC's jurisdiction on August 23, 2013, he would still have had to file suit by November 21, 2013. Under either scenario, Tyler's Title VII claim is barred as untimely. The Court notes again that Tyler has not challenged, or even addressed, the limitations provision in his Memorandum Contra Defendant's Motion for Summary Judgment, nor has he requested leave to file a Sur-Reply to address the issue. Because this action was filed outside the six-month limitations period defined in the provision of his employment agreement, FXF's motion is sustained.

17

## V. **CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment (Doc. #14) is SUSTAINED. As FXF is entitled to judgment as a matter of law because of the threshold issue of the limitations period, it is unnecessary for the Court address the arguments directed to the merits of Tyler's Title VII claim, which is DISMISSED WITH PREJUDICE. Judgment will be entered in favor of Defendant and against Plaintiff.

Defendants' pending Motions in Limine (Doc. #25 & Doc. #26) and Motion to Continue Deadline for Filing Joint Final Pretrial Order and Notice of Non-Compliance with General Order 12-01 (Doc. #29) are OVERRULED AS MOOT.[5]

---

[5] Among the motions deemed moot, Defendant's Motion to Continue Deadline for Filing Joint Final Pretrial Order and Notice of Non-Compliance with General Order 12-01 (Doc. #29) states:

> From Defendant's perspective, it appears that Plaintiff's counsel may no longer be prosecuting this action. Plaintiff's counsel has not complied with General Order No. 1 as it relates to the Joint [Final Pretrial] Order and so the Joint Order cannot be filed timely. Plaintiff's counsel has not been heard from concerning the Joint Order in response to repeated contacts since April 13th from the office of Defendant's counsel. Moreover, Plaintiff's counsel did not depose any of Defendant's key witnesses and did not participate in the April 17, 2015 trial deposition of a material defense witness (Lance Appleman).

Plaintiff's counsel has filed no response explaining the failure to cooperate with opposing counsel in the drafting and filing of the Joint Final Pretrial Order. Based on Defendant's statements, it appears to the Court that Plaintiff has abandoned this lawsuit.

The captioned case is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

Date: April 23, 2015

WALTER H. RICE
UNITED STATES DISTRICT JUDGE